UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – x

|  |  |  |
|---|---|---|
| JOULES LIMITED, | : | |
| Plaintiff, | : | Civil Action No.: 1:15-cv-03645-KMW |
| | : | |
| v. | : | **DEFENDANT'S POST-TRIAL** |
| | : | **FINDINGS OF FACT AND** |
| MACY'S MERCHANDISING GROUP, INC., | : | **CONCLUSIONS OF LAW** |
| | : | |
| Defendant. | : | |

– – – – – – – – – – – – – – – – – – – x

Defendant Macy's Merchandising Group, Inc. ("Defendant" or "MMG") hereby submits its Post-Trial Findings of Fact and Conclusions of Law.  To the extent any Finding of Fact contains a Conclusion of Law, or vice versa, they shall be considered as such.

## I.   POST-TRIAL FINDINGS OF FACT

### A.   THE PARTIES

1.   Plaintiff Joules Limited ("Plaintiff" or "Joules") is a Limited Company, registered and headquartered in England.  (Stipulated Facts (SF) No. 10.)

2.   Joules is owned by Joules Group PLC, shares in which are publicly traded on the London Stock Exchange.  (SF No. 10.)

3.   Joules is a retail seller of clothing in a number of countries throughout the world, including the United States.  (Joule Aff. ¶ 1.)

4.   Joules has no retail stores in the United States.  (Joule Aff. ¶ 16.)

5.   MMG is a New York corporation and wholly owned subsidiary of Macy's, Inc. (SF No. 11.)

6.  Macy's Inc. operates department stores throughout the U.S. under the name, *inter alia*, Macy's and also sells goods via the website *www.macys.com*.  (SF No. 12.)

7.  MMG is responsible for developing and producing private brands for Macy's, Inc. (SF No. 13; Brandefine Aff. ¶ 3.)

8.  Macy's, Inc. is not a party to this lawsuit.  (First Amended Complaint, ECF No. 34.)

**B.   PLAINTIFF'S TRADEMARK REGISTRATION**

9.  Joules owns U.S. Trademark Registration No. 3,696,021, issued on October 13, 2009, for the mark JOULES for use in connection with various goods in International Class 18, various clothing items and accessories, including women's clothing, in International Class 25, and online retail store services featuring clothing, footwear, headwear, leather goods and accessories therefor in International Class 35.  (SF No. 14; Exs. P97, P238.)

10. The registration is for the mark JOULES in block form.  (Ex. P97.)

**C.   PLAINTIFF'S BUSINESS**

11. Joules originally started as a family business in the United Kingdom under the name Joule & Sons in the 1970's.  (SF No. 15; Trial Tr. 5:6–14; 6:9–10; Joule Aff. ¶¶ 4–6.)

12. In 1994, the brand JOULES was adopted in place of Joule & Sons and products, including hats, scarfs, accessories and outerwear were marketed and sold under the JOULES name in the United Kingdom.  (SF No. 15; Trial Tr. 5:6–14; 6:9–10; Joule Aff. ¶¶ 4–7.)

13. The JOULES brand is derived from the Joule surname.  (Trial Tr. 5:15–6:10.)

14. In 2004, Joules adopted the script form of its logo.  (Joule Aff. ¶ 9.)

15. The Joules script logo is derived from the handwriting of Mr. Tom Joule.  (Trial Tr. 17:15–20.)

16. The Joules script logo is used in a colored rectangular box for advertising and promotional materials and product hang tags.  (Trial Tr. 20:13–25; Exs. P107, P109, P113, P151.)

17. The JOULES brand includes rain boots, other footwear, and apparel.  (Joule Aff. ¶ 25.)

18. The JOULES brand is best known in the United States for its rain boots.  (Trial Tr. 10:21–25.)

19. The vast majority of Joules' media coverage in the United States has been about its rain boots and rainwear.  (Trial Tr. 11:13–12:13; Ex. P241.)

20. Joules' current sales in the United States are comprised of 50% footwear and 50% clothing.  (Trial Tr. 11:5–10; 13:5–6.)

21. Joules' ten year plan projects that the percentage of sales of footwear in the United States will increase over time.  (Ex. D2.)

22. Joules offers it goods for sale directly to consumers in the U.S. via its website *www.joulesusa.com*.  (SF No. 16; Joule Aff. ¶ 28; Wood Aff. ¶ 16.)

23. Joules also sells it goods through approximately 17–20 house accounts with U.S. retailers such as Von Maur, Nordstrom, REI, Target.com, Amazon.com, and Backcountry.com.  (Wood Aff. ¶¶ 12–13; Trial Tr. 53:5–7.)

24. Joules also sells its goods in the United States through two distributors (Frantisi and The Madgin Group) that purchase products from Joules and then sell such products to smaller independent retail stores.  (Wood Aff. ¶ 12; Joule Aff. ¶ 10.)

25. Joules has no licensees for clothing in the United States.  (Trial Tr. 10:2–4.)

26. The only license Joules has in the United States is for a chewy dribble bib for teething toddlers called the Neckerchew.  (Trial Tr. 9:17–10:1.)

27. Joules' goods are not sold in Macy's brick and mortar stores or at *www.macys.com*. (SF No. 47.)

28. Joules has recorded sales of products in the U.S. dating back to at least 2001.  (Joule Aff. ¶ 30.)

29. Joules launched its U.S. website, *www.joulesusa.com*, in 2010.  (Joule Aff. ¶ 11; Trial Tr. 286:8–11.)

30. In May 2014, Joules opened a sales office and showroom in New York City.  (Joule Aff. ¶ 14.)

31. Joules recently expanded to a larger sales office and showroom in New York City. (Joule Aff. ¶ 14; Trial Tr. 5:3–5.)

32. Joules recently has been involved in a initial public offering (IPO) in the United Kingdom.  (Trial Tr. 4:25–5:2.)

33. Joules' sales in the United States have dramatically increased since 2013.  (Trial Tr. 4:20–24; Joule Aff. ¶¶ 30–31; Wood Aff. ¶ 11; Ex. P239.)

34. Joule's sales strategy is to use its footwear to enter a market and to build up trust with department stores or clients and then attempt to expand in other product categories.  (Trial Tr. 10:21–25; 13:7–12; 33:14–34:15; 59:15–60:24; Wood Aff. ¶ 18; Exs. D5, D14.)

35. In the last three years, Joules has spent $2.1 million marketing the JOULES brand in the United States.  (Joule Aff. ¶ 32; Ex. P240; Trial Tr. 10:8–15.)

36. Approximately $900,000 of the $2.1 million dollars in marketing expenses went towards mail order catalogs which have been discontinued.  (Ex. P240; Trial Tr. 10:16–18.)

37. Approximately $250,000 of the $2.1 million dollars in marketing expenses was spent on rent for Joules' showroom in New York City.  (Ex. P240; Trial Tr. 10:19–20.)

**D.     PLAINTIFF'S COEXISTENCE AGREEMENT**

38. Joules and Jules SA are parties to a Coexistence Agreement.  (Ex. D16; Trial Tr. 22:11–18.)

39.  The Coexistence Agreement  covers the use by Joules and Jules SA of the marks JOULES and JULES throughout the world.  (Ex. D16.)

40. Pursuant to Par. 3.1 of the Coexistence Agreement, Joules "will not use the trade marks JULE or JULES."  (Ex. D16.)

41. Pursuant to Par. 1.1.2 of the Coexistence Agreement, Jules SA is permitted to use the following marks in the United States: JULE OPENSTYLE, OPENSTYLE JULE, JULE MY MAN, MY MAN JULE, JULE RENDEZ-VOUS, RENDEZ-VOUS JULE. (Ex. D16.)

**E.     DEFENDANT'S DEVELOPMENT OF MAISON JULES PRODUCT LINE**

42. MAISON JULES is a private brand developed by MMG for sale exclusively by Macy's, either in Macy's retail stores or at *www.macys.com*.  (Brandefine Aff. ¶ 11; Trial Tr. 136:1–2, 201:19–23.)

43. The process of developing a private brand starts with identifying a "white space" opportunity in the market.  (Brandefine Aff. ¶ 13.)

44. A white space is an opportunity to provide a new product or service to a particular customer who did not formerly exist or who has just been identified.  (Brandefine Aff. ¶ 13.)

45. The MAISON JULES product line developed out of MMG's identification of a "Girl Next Door" white space in 2011.  (Brandefine Aff. ¶ 14; Trial Tr. 156:8–16, 164:19–24.)

46. The Girl Next Door white space was identified via market research which acknowledged Macy's low ranking and penetration in the market of millennial women who identify with a Girl Next Door aesthetic.  (Brandefine Aff. ¶ 14.)

47. The Girl Next Door private brand was an opportunity within Macy's "Impulse" category, which is generally directed to millennial women.  (Brandefine Aff. ¶ 16.)

48. "Impulse" is the name of a department within Macy's which is directed to millennial women (rather than an "impulse" purchase).  (Brandefine Aff. ¶ 16; Trial Tr. 182:16–183:6.)

49. A millennial is someone in the 18–30 age range.  (Brandefine Aff. ¶ 16.)

50. Macy's target shopper for the Girl Next Door private brand is a 25 year old woman.  (Brandefine Aff. ¶ 16; Trial Tr. 181:11–21.)

51. In the first half of 2012, MMG conducted research to identify the specific style the Girl Next Store brand would have and the types of clothing it would include.  (Brandefine Aff. ¶¶ 17–18; Ex. D20.)

52. The inspiration for the MAISON JULES brand, as far back as May 2012, was very much influenced by Parisian street style and French socialites.  (Brandefine Aff. ¶ 22; Exs. D19,  D20.)

53. The "Brand DNA" involved French aspirational styling; cultivated dressing with a feminine twist; not basic, not classy, not preppy; and cultivated looks to show multiple end uses to key wardrobe staples.  The "Style Icons" included famous socialites, such as Olivia Palermo and Charlotte Gainsbourg, who have the essence of what the brand should be.  (Brandefine Aff. ¶ 22; Exs. D19, D20, D22.)

54. The MAISON JULES line is positioned as a wear-to-work brand of women's apparel that is also casual enough to be worn on the weekends.  (Brandefine Aff. ¶ 27.)

**F.    ORIGIN OF MAISON JULES AND LOGO**

55. After developing the Girl Next Door brand based on a the French aesthetic, MMG's marketing team selected a brand name and logo that would reflect the same. (Brandefine Aff. ¶ 30–31; Trial Tr. 149:25–150:16; Ex. D23.)

56. "MAISON" was selected for its association with French fashion.  (Brandefine Aff. ¶ 32; Trial Tr. 202:4–12, 203:9–19.)

57. "JULES" comes from the classic 1962 Truffaut film "Jules & Jim," which captured the romance and seduction of Paris.  (Brandefine Aff. ¶ 32; Trial Tr. 157:6–14, 202:13–17; Ex. D23.)

58. "JULES" is dual gender, which was important to MMG since it allows the brand to potentially expand into men's products in the future.  (Brandefine Aff. ¶ 33; Trial Tr. 148:13–22; Ex. D23.)

59. Another reason for selecting MAISON JULES is that it is recognizable and easy for Americans to pronounce.  (Brandefine Aff. ¶ 33; Trial Tr. 149:3–7; Ex. D23.)

60. MMG also liked the sound of "JULES" as soft, romantic, and fun to say, and because it was unlike any other name currently in Macy's Impulse department.  (Brandefine Aff. ¶ 33; Trial Tr. 149:8–14; Ex. D23.)

61. MMG also liked that "MAISON JULES" suggests a variety of contrasting graphic treatments, e.g., hard/soft, typed/handwritten, masculine/feminine.  (Brandefine Aff. ¶ 33; Ex. D23.)

62. MMG was unaware of Plaintiff or the JOULES brand during the development of the Girl Next Door concept and the selection of the MAISON JULES name.  (Brandefine Aff. ¶ 38; Trial Tr. 157:18–23, 185:14–23.)

63. Joules admits that there is no evidence of MMG copying JOULES in the development of its MAISON JULES name and logo.  (Trial Tr. 17:23–25.)

**G.      CLEARANCE OF MAISON JULES NAME**

64. After deciding on the MAISON JULES name, on August 28, 2012, MMG conducted a trademark search to identify any conflicting marks.  (SF No. 21; Brandefine Aff. ¶¶ 39–40.)

65. The August 28, 2012 trademark search for MAISON JULES returned in the Web Common Law section, at page 256 of 401, Joules' UK  web page at http://www.joules.com/en-GB/Homepage.action.  (Ex. D24;  Brandefine Aff. ¶ 42.)

66. The August 28, 2012 trademark search report did not show any other information relating to Plaintiff, including Plaintiff's website, *www.joulesusa.com*.  (Ex. D24; Trial Tr. 286:21–287:8.)

**H.      MMG's TRADEMARK APPLICATION**

67. Prior to launching the MAISON JULES line of women's clothing, MMG filed an intent-to-use trademark application with the United States Patent and Trademark Office on November 14, 2012, seeking registration of the mark MAISON JULES in connection with various goods, including clothing in International Class 25.  (SF No. 20; Ex. D78.)

68. On December 19, 2013, the USPTO issued an Office Action regarding MMG's MAISON JULES trademark application.  (Ex. D80.)

69. Among other things, in the December 19, 2013 Office Action, the Examiner found no conflicting marks that would bar registration of MAISON JULES under Trademark Act § 2(d).  (Ex. D80.)

70. On June 17, 2013 MMG responded to the Office Action and advised the Examiner that "the English translation of MAISON in the mark is house."  (Ex. D81.)

71. MMG was not required to disclaim "MAISON" at any point during prosecution of its MAISON JULES application.  (Exs. D78, D80, D81, D82.)

72. On July 31, 2013 the USPTO issued a Notice of Publication for the MAISON JULES mark, and the mark was subsequently published.  (Ex. D82.)

73. Joules filed a Notice of Opposition opposing the registration of MMG's MAISON JULES trademark application on January 17, 2014, alleging, *inter alia*, that the MAISON JULES mark should not register because of a likelihood of confusion with the JOULES and LITTLE JOULE trademarks.  (First Amended Complaint, ECF No. 34.)

## I.    PLAINTIFF'S CEASE AND DESIST LETTER

74. Joules became aware of the MAISON JULES trademark in approximately December 2012 through a trademark watch service.  (SF No. 22; Ex. P137; Trial Tr. 13:24–14:1.)

75. On or about February 6, 2013, Joules, through its UK trademark attorneys, emailed a cease and desist letter to MMG's European trademark attorneys in Germany, requesting that Defendant withdraw the MAISON JULES Trademark Application and forbear or cease use of MAISON JULES because of the potential for confusion with the JOULES trademark.  (SF No. 23; Ex. D25.)

76. On April 9, 2013, Joules, through its UK trademark attorneys, sent a cease and desist letter via e-mail to MMG's U.S. trademark counsel.  (SF No. 24; Trial Tr. 14:3–5; Ex. D25.)

77. MMG first became aware of Joules when its U.S. counsel received the April 9, 2013 e-mail from Joules' counsel.  (Ex. D25; Brandefine Aff. ¶ 43.)

78. U.S. counsel for MMG responded to the cease and desist letter on April 12, 2013, denying any potential for confusion.  (SF No. 25; Trial Tr. 14:13–15, 195:11–22; Ex. D26.)

79. The April 12, 2013 letter contained numerous reasons as to why MMG did not believe there was any potential likelihood of confusion between "JOULES" and "MAISON JULES" in the United States.  (Trial Tr. 15:18–20; Ex. D26; Brandefine Aff. ¶ 44.)

**J.      MMG's MAISON JULES PRODUCT LINE**

80. The MAISON JULES product line is comprised of women's clothing aimed at millennials.  (Brandefine Aff. ¶ 14; Trial Tr. 181:11–21.)

81. The MAISON JULES line of women's clothing was launched in July 2013 and was available for purchase in approximately 150 Macy's department stores and also online at *www.macys.com*.  (SF No. 26; Brandefine Aff. ¶¶ 20, 45–46.)

82. The MAISON JULES line does not include rain boots, rainwear, men's clothing or children's clothing.  (Ex. D44; Trial Tr. 13:18–23.)

83. New MAISON JULES products are only sold at Macy's stores and on Macy's website with one exception, U.S. Navy Military exchange stores.  (Brandefine Aff. ¶ 45; Trial Tr. 132:5–17.)

84. MMG sells new MAISON JULES products to the Singer Group which in turn sells to the military.  (Brandefine Aff. ¶ 45.)

85. Sales at the military exchange stores make up a very small percentage of sales of MAISON JULES products.  (Brandefine Aff. ¶ 45; Trial Tr.132:20–25.)

86. A limited number of MAISON JULES products are showing up on third-party internet websites such as Amazon.com.  (Urban Aff. ¶ 6.)

87. MMG does not sell MAISON JULES products to Amazon.  (Urban Aff. ¶ 7; Trial Tr. 175:16–21.)

88. A separate Macy's entity known as Macy's Logistics & Operations ("MLO") purchases unsold, "pennied out," items in bulk from the Macy's stores.  (Urban Aff. ¶ 7; Trial Tr. 177:24–178:9.)

89. "Pennied out" items are out-of-season pieces that have marked down multiple times.  (Trial Tr. 134:12–23.)

90. MMG and MLO are independent entities which share a common parent, Macy's, Inc.  (Trial Tr. 178:10–18.)

91. MLO is not a party to this lawsuit.  (First Amended Complaint, ECF No. 34.)

92. Less than 1% of the MAISON JULES current on hand inventory at Macy's has been offered for sale at Amazon.com.  (Trial Tr. 178:19–179:14.)

93. Similar to Amazon.com, Sears.com has a "marketplace" section of its website where third parties sell goods.  (Trial Tr. 179:15–180:6.)

94. MAISON JULES products are not sold by Sears.  (SF No. 44; Trial Tr. 180:7–181:3.)

95. MAISON JULES products are not sold on *www.joules.com* or *www.joulesusa.com*.  (SF No. 46; Trial Tr. 72:14–20.)

96. The sites *www.joules.com* and *www.joulesusa.com* only sell JOULES products. (Trial Tr. 72:14–20.)

97. JOULES products not sold at Macy's stores or at *www.macys.com*.  (SF No. 47; Trial Tr. 72:14–20.)

## K.   PLAINTIFF'S SURVEY

98. Dr. Michael Belch was retained by Joules to design and implement a survey and write a report relating to the alleged likelihood of confusion between JOULES and MAISON JULES.  (Ex. P75.)

99. Dr. Belch designed and used a modified lineup survey under circumstances where the Maison Jules and Joules products were not sold in competitive proximity.  (Belch Aff. ¶ 6; Poret Aff. ¶ 24.)

100.    Dr. Belch's survey universe was not limited to Macy's shoppers.  (Trial Tr. 91:24–92:1.)

101.    Dr. Belch selected the control, MICHAEL STARS, based on limited suggestions from non-expert, female millennial shoppers referred by the daughter of his wife's friend.  (Trial Tr. 83:14–84:2; Ex. P79.)

102.    Dr. Belch did not test for confusion in brick and mortar stores.  (Trial Tr. 88:23–89:2.)

103.    Dr. Belch did not test for consumer perceptions on Amazon.com.  (Trial Tr. 90:19–21.)

104.    16.2% of the respondents in Dr.  Belch's survey had seen or heard of JOULES. (Trial Tr. 87:2–8.)

105.    Dr. Belch's stimulus for the MAISON JULES website did not reflect actual

marketplace conditions as Macy's name and URL were removed by Dr. Belch.  (Trial

Tr. 94:6–95:9.)

106.    Respondents were asked the following series of questions:

QA1a.  Please indicate whether you believe the brand you just saw is:
The same company, or is owned by the same company, as the very first
brand shown.

QA2a.  Please indicate whether you believe the brand you just saw is:
Affiliated with the company of the very first brand shown.

QA3a.  Please indicate whether you believe the brand you just saw is:
Has permission from the company of the very first brand shown to use this
name on their product.  (Belch Aff. ¶ 7, 22; Ex. P76.)

107.    According to Dr. Belch's report, 123 respondents (39.9%) believed that Joules

and Maison Jules are the same company, or are owned by the same company; and 48

respondents (15.6%) believed that Joules and Michael Stars are the same company, or

are owned by the same company.  (Belch Aff. ¶¶ 8–11.)

108.    Nineteen of the respondents who Dr. Belch considered to be confused indicated

that the confusion was a result of the Maison Jules and Joules brands having similar

webpages.  (Trial Tr. 99:24–100:3.)

109.    Twenty-two of the respondents who Dr. Belch considered to be confused

indicated that the confusion was a result of the similar look and style of the clothing.

(Trial Tr. 100:4–14.)

110.    The number of coded qualitative responses from Dr. Belch's survey matches the

total number of respondents in Dr. Belch's survey.  (Trial Tr. 117:25–118:12; Ex.

P83.)

**L.     DEFENDANT'S SURVEY**

111.    Mr. Hal Poret was retained by MMG to design and implement a survey and write a report relating to the alleged likelihood of confusion between JOULES and MAISON JULES.  (Poret Aff. ¶ 35.)

112.    Mr. Poret used what is called an "Eveready" methodology, in which he exposed survey participants to selected images showing the MAISON JULES mark and asked them standard questions seeking to determine if any of them were confused into believing that Maison Jules products were made by Joules or that Maison Jules was affiliated with or authorized by Joules.  (Poret Aff. ¶ 38.)

113.    An Eveready Survey is an appropriate format because it exposes respondents to the allegedly infringing Maison Jules products as they appear in the marketplace – i.e., outside the presence of Joules brand products.  (Poret Aff. ¶ 38.)

114.    To select the people who would participate in Mr. Poret's survey, he asked a series of questions seeking to replicate the exact universe and demographics that Dr. Belch used.  (Poret Aff. ¶ 42.)

115.    Dr. Belch did not disqualify those who never shopped at Macy's either in-store or online, whereas Mr. Poret only counted customers who had shopped at Macy's. (Poret Aff. ¶ 43.)

116.    Mr. Poret's survey consisted of two groups: (i) those who were likely to shop online at Macys.com, and were shown images of Maison Jules clothing sold online at Macys.com; and (ii) those who were likely to shop in Macy's stores, and were shown images of the Maison Jules display and products sold inside a Macy's brick and mortar store.  (Poret Aff. ¶ 48.)

117.    Mr. Poret found only 0.1% (1 out of all 800) respondents appeared to possibly confuse Maison Jules with Joules.  (Poret Aff. ¶ 98.)

**M.    NO LIKELIHOOD OF CONFUSION**

**1.    THE JOULES MARK IS WEAK**

118.    The JOULES mark is derived from the company founder's surname.  (Trial Tr. 5:15–6:10.)

119.    Joules has admitted that the JOULES mark is not well-known in the United States.  (Trial Tr. 87:12–88:2; Exs. P75, P86.)

**2.    THE MARKS ARE VISUALLY AND ACOUSTICALLY DIFFERENT**

120.    MAISON JULES consists of two words, while JOULES is one word.  (Trial Tr. 20:1–3.)

121.    Macy's only uses the MAISON JULES mark in its composite form, with MAISON in block form and JULES in script.  (Ex. D23.)

122.    The typeface used for the JOULES mark is the handwriting of Tom Joule, while the typeface for the "JULES" portion of the MAISON JULES mark was inspired by various French sources, including "Moulin Rouge" and "Lafayette."  (Ex. D23; Brandefine Aff. ¶¶ 32, 34; Trial Tr. 17:15–20.)

123.    Joules has agreed that a third-party clothing manufacturer can use "JULE" in the United States, in composite form, without causing confusion.  (Ex. D16.)

**3.    THE PRODUCTS ARE NOT SOLD IN COMPETITIVE PROXIMITY**

124.    MAISON JULES products are not sold on *www.joules.com* or *www.joulesusa.com*.  (SF No. 46.)

125.    MAISON JULES products are not sold at any of Joules' brick and mortar house accounts.  (Brandefine Aff. ¶ 45.)

126.    MAISON JULES products are not sold by either of Joules' U.S. distributors. . (Brandefine Aff. ¶ 45.)

127.    MAISON JULES products are not sold at any of the independent retailers which sell JOULES products.  (Brandefine Aff. ¶ 45.)

128.    The sites *www.joules.com* and *www.joulesusa.com* only sell JOULES products. (Trial Tr. 72:14–20.)

129.    JOULES products are not sold at Macy's stores or a *www.macys.com*.  (SF No. 47; Trial Tr. 21:1–4.)

130.    JOULES products and MAISON JULES products are never sold side by side in the same building.  (Trial Tr. 21:1–20.)

131.    Only women's clothing is sold under MAISON JULES.  (Ex. D44.)

132.    The MAISON JULES product line does not include rain boots or rainwear.  (Ex. D44; Trial Tr. 13:18–23.)

133.    Various items of men's, women's, and children's apparel, accessories, and rain boots are sold under the JOULES brand.  (Ex. D9.)

### 4.    NO EVIDENCE OF ACTUAL CONFUSION

134.    Joules has presented no evidence that a single consumer has ever been confused by the MAISON JULES name.  (Trial Tr. 23:19–22; 54:22–55:4.)

135.    Joules' U.S. distributors have never received a single complaint from customers regarding MAISON JULES.  (Trial Tr. 23:23–25; 64:20–65:2.)

136.    Joules has never received a single complaint regarding the MAISON JULES brand from any of its house accounts, including Von Maur.  (Trial Tr. 52:19–53:11.)

137.    Joules has presented no evidence as to the state of mind of Peter Chang.  (Trial Tr. 26:10–20; Ex P14.)

138.    There is no evidence that the spelling of "Maison Joules" contained in Peter Chang's LinkedIn page is a result of confusion.  (Trial Tr. 26:10–20; Ex P14.)

139.    Peter Chang was never contacted by Joules and was not called to testify at trial. (Trial Tr. 26:10–20.)

140.    Joules has presented no evidence as to the state of mind of the author of the Vinted webpage.  (Trial Tr. 26:24–27:9; Ex. P167.)

141.    There is no evidence that the spelling of "Maison Joules" contained in the Vinted webpage is a result of confusion.  (Trial Tr. 26:24–27:9; Ex. P167.)

142.    The Vinted author was never contacted by Joules and was not called to testify at trial.  (Trial Tr. 27:2–6.)

143.    Macy's has not purchased any ad words or key words which contain the word "joules" as part of its search engine optimization for the sale of MAISON JULES products online.  (Ex. D46.)

144.    MMG has procedures in place to ensure that any information regarding confusion would be brought to the attention of the brand director.  (Brandefine Aff. ¶¶ 76–78; Trial Tr. 128:14–130:13, 174:1–175:15.)

145.    MMG has never been aware of a single instance of confusion by a customer between the JOULES and MAISON JULES product lines.  (Brandefine Aff. ¶ 75; Trial Tr. 128:14–130:13, 174:1–175:15.)

146.    Joules has presented no evidence of the operations of the Google.com or Macys.com search algorithms.  (Exs. P233, P234, P235.)

147.    Joules has identified searches on Google.com conducted by Tom Joule and Dave

Wood incident to this litigation for "maison joules" and "macy's joules."  (SF Nos.

36, 51; Exs. P233, P234.)

148.    Joules has identified searches on Macys.com conducted by Tom Joule incident to

this litigation for "joules."  (SF No. 57; Ex. P235.)

149.    The search for "joules" on Macys.com conducted at the present time shows "0

results for joules" on the Macy's online website.  (SF No. 53.)

150.    Joules has presented no evidence of any searches actually conducted by any

consumer.  (Exs. P233, P234, P235.)

### 5.    MMG OPERATED IN GOOD FAITH

151.    MMG was unaware of Plaintiff or the JOULES brand during the development of

the Girl Next Door concept and the selection of the MAISON JULES name.

(Brandefine Aff. ¶ 38; Trial Tr.157:18–23, 185:14–23.)

152.    Joules admits that there is no evidence of MMG copying JOULES in the

development of its MAISON JULES name and logo.  (Trial Tr. 17:23–25.)

153.    After deciding on the MAISON JULES name, on August 28, 2012, MMG

conducted a trademark search to identify any conflicting marks.  (SF No. 21;

Brandefine Aff. ¶¶ 39–40.)

154.    The August 28, 2012 trademark search for MAISON JULES returned in the Web

Common Law section, at page 256 of 401, Joules' UK  web page at

http://www.joules.com/en-GB/Homepage.action.  (Ex. D24;  Brandefine Aff. ¶ 42.)

155.    The August 28, 2012 trademark search report did not show any other information

relating to Plaintiff, including Plaintiff's website, *www.joulesusa.com*.  (Ex. D24;

Trial Tr. 286:21–287:8.)

156.    On April 9, 2013, Joules, through its UK trademark attorneys, sent a cease and desist letter via e-mail to MMG's U.S. trademark counsel.  (SF No. 24; Trial Tr. 14:3–5; Ex. D25.)

157.    MMG first became aware of Joules when its U.S. counsel received the April 9, 2013 e-mail from Joules' counsel.  (Ex. D25; Brandefine Aff. ¶ 43.)

158.    U.S. counsel for MMG responded to the cease and desist letter on April 12, 2013, denying any potential for confusion.  (SF No. 25; Trial Tr. 14:13–15, 195:11–22; Ex. D26.)

159.    The April 12, 2013 letter contained numerous reasons as to why MMG did not believe there was any potential likelihood of confusion between "JOULES" and "MAISON JULES" in the United States.  (Trial Tr. 15:18–20; Ex. D26; Brandefine Aff. ¶ 44.)

**6.      THE PARTIES GOODS ARE OF COMPARABLE QUALITY**

160.    The products sold under the JOULES and MAISON JULES product lines are of approximately equal quality.  (SF No. 29; Trial Tr. 48:24-49:5.)

**7.      PURCHASERS OF MAISON JULES PRODUCTS ARE SOPHISTICATED**

161.    The MAISON JULES target consumers pay attention to details in their purchasing decision.  (Trial Tr. 182:13–15.)

**II.**    **POST-TRIAL CONCLUSIONS OF LAW**

**A.**    **CLAIMS**

1.  The Lanham Act governs claims of federal trademark infringement pursuant to 15 U.S.C. § 1114 and federal unfair competition pursuant to 15 U.S.C. § 1125.

2.  New York common law governs claims of common law trademark infringement.

3.  To prevail on claims of federal and state trademark infringement, Plaintiff must prove the following elements: (1) Plaintiff owns the asserted trademark; (2) the asserted trademark is a valid and protectable trademark; (3) Defendant used the accused trademark in commerce; (4) Defendant used the accused mark in commerce without Plaintiff's consent; and (5) Defendant's use of the accused mark is likely to cause confusion. *Diesel S.P.A. v. Doe*, No. 14-CV-4592 (KMW), 2016 U.S. Dist. LEXIS 2720, at *6–7 (S.D.N.Y. Jan. 8, 2016); *Nike, Inc. v. Top Brand Co. Ltd.*, No. 00 Civ. 8179 (KMW) (RLE), 2005 U.S. Dist. LEXIS 42374, at *22–23 (S.D.N.Y. July 13, 2005).

4.  To prevail on a claim of federal unfair competition, Plaintiff must prove the following elements: (1) Plaintiff owns the asserted trademark; (2) the asserted trademark is a protectable trademark; (3) Defendant used the accused trademark in commerce; (4) Defendant used the accused mark in commerce without Plaintiff's consent; and (5) Defendant's use of the accused mark is likely to cause confusion as to the source or sponsorship of the product.  *Diesel S.P.A. v. Doe*, No. 14-CV-4592 (KMW), 2016 U.S. Dist. LEXIS 2720, at *6–7 (S.D.N.Y. Jan. 8, 2016); *Forschner Grp. v. Arrow Trading Co.*, 904 F. Supp. 1409, 1416–17 (S.D.N.Y. 1995).

B.     **LIKELIHOOD OF CONFUSION**

    1.     **DEFERENCE TO THE U.S. PATENT AND TRADEMARK OFFICE**

5.   If a trademark examiner believes that registration is warranted, the mark is published in

the Official Gazette of the Patent and Trademark Office.  *See* 15 U.S.C. § 1062.

6.   Decisions by the USPTO should be afforded great weight.  *Syntex Labs. v. Norwich

Pharmacal Co.*, 437 F.2d 566, 569 (2d Cir. 1971) (holding USPTO's refusal to register

mark is entitled to "great weight"); *Chum Ltd. v. Lisowski*, No. 98 Civ. 5060 (KMW),

2001 U.S. Dist. LEXIS 2462, at *24 n.7 (S.D.N.Y. Mar. 12, 2001) (giving weight to

USPTO examiner's determination that mark is generic); *Cullman Ventures, Inc. v.

Columbian Art Works, Inc.*, 717 F. Supp. 96, 120 (S.D.N.Y. 1989) (USPTO's

determination with respect to descriptiveness of trademarks "is entitled to great weight.").

7.   Even initial conclusions of the Trademark Office should be accorded weight.  *Genesee

Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 148 n.11 (2d Cir. 1997) (The court

"accord[ed] weight" to the examiner's decision to publish the mark, even though it was

not yet registered.).

    2.     **THE POLAROID FACTORS**

8.   In deciding whether a plaintiff has established likelihood of confusion, courts in the

Second Circuit consider the eight-factor balancing test introduced in *Polaroid Corp. v.

Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).  *Star Indus. v. Bacardi & Co.*, 412

F.3d 373, 384 (2d Cir. 2005).

9.   The eight-factors of the Polaroid test are: "(1) strength of the trademark; (2) similarity of

the marks; (3) proximity of the products and their competitiveness with one another; (4)

evidence that the senior user may 'bridge the gap' by developing a product for sale in the

market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005).

10. The application of the *Polaroid* test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001)).

11. "[E]ach factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986).

## Strength of the Asserted Mark

12. The strength of a trademark encompasses two different concepts: "inherent distinctiveness" and "acquired distinctiveness." *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 163 (2d Cir. 2004) (citing *Virgin v. Nawab*, 335 F.3d 141, 147 (2d Cir. 2003)).

13. The scale of inherent distinctiveness, from least to most distinctive, is described in terms of marks that are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 163 (2d Cir. 2004) (citing *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001)).

14. "Acquired distinctiveness, as opposed to inherent distinctiveness, refers to the 'recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's

goods or services.'" *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 163 (2d Cir. 2004) (quoting *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 131 (2d Cir. 2004)).

15. "[T]o achieve the status of a strong mark, plaintiff must demonstrate distinctiveness in the *relevant* market, for if the mark is not recognized by the relevant consumer group, a similar mark will not deceive those consumers and thereby increase search costs." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 132 (2d Cir. 2004) (emphasis included) (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364 (2d Cir. 1959)).

## Similarity of the Marks

16. In assessing the similarity of two marks in a likelihood of confusion analysis, "a mark must be viewed in 'its complete form rather than dissect[ed] into its component parts.'" *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 275 (S.D.N.Y. 2006) (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F. Supp. 2d 389, 395 (S.D.N.Y. 1998)).

17. "Trademarks should be compared in their entirety, because 'juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar.'" *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 315 (S.D.N.Y. 2000) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984)).

18. Likelihood of confusion cannot be based on only part of a mark; rather, the overall impression created by the marks in their entirety must be considered, keeping in mind all the things the general buying public will likely perceive and remember about the marks. *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993) ("In

assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers."); *see also Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744–45 (2d Cir. 1998) (finding similarly sounding map names "StreetSmart" and "Streetwise" not confusingly similar because of differences in logos, typefaces, the maps' folds, and the sizes and colors of the writing).

19. A disclaimer made by an applicant in its application to register its mark "has no legal effect on the issue of likelihood of confusion" as the public is unaware of disclaimers made by an applicant during prosecution. *In re Nat'l Data Corp.*, 753 F.2d 1056, 1059 (Fed. Cir. 1985).

20. "[I]t is inappropriate to give the presence or absence of a disclaimer any legal significance." *In re Nat'l Data Corp.*, 753 F.2d 1056, 1059 (Fed. Cir. 1985).

21. The focus in determining likelihood of confusion must be on the perspective of the purchasing public, considering the marks in their entireties, regardless of whether a component of a mark has been disclaimed. *See Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1341 (Fed. Cir. 2015) (remanding to the TTAB for failure to consider mark as a whole, where the TTAB erred by only considering identical dominant terms in the marks and not giving any significance to the disclaimed term); *Shen Mfg. Co. v. Ritz Hotel, Ltd.*, 393 F.3d 1238, 1243 (Fed. Cir. 2004) ("The disclaimed elements of a mark, however, are relevant to the assessment of similarity . . . because confusion is evaluated from the perspective of the purchasing public, which is not aware that certain words or phrases have been disclaimed." (citation omitted)).

### Competitive Proximity of the Products

22. In determining whether two products compete with each other, "the court may consider whether the products differ in content, geographic distribution, market position, and audience appeal." *W.W.W. Pharm. Co. v. Gillette*, 984 F.2d 567, 573 (2d Cir. 1993).

### Actual Consumer Confusion

23. It is hornbook trademark law that periods of simultaneous use of two marks without any evidence of actual confusion demonstrates that there is no likelihood of confusion. *See McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1136 (2d Cir. 1979) ("It is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion."); *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983) ("[N]o evidence of confusion for over a three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal.").

24. Even if there are instances of actual confusion, there can still be no likelihood of confusion if, for example, the instances of actual confusion were rare and infrequent. *See Atlantic Richfield Co. v. Arco Globus Int'l Co.*, No. 95 Civ. 6361 (JFK), 1997 U.S. Dist. LEXIS 9397, at *23 (S.D.N.Y. May 29, 1997).

25. It is beyond dispute that mere spelling errors do not evidence actual confusion, particularly where there are other circumstances showing that the person in question understood the distinction between the two trademarks. *Hormel Foods Corp. v. Jim Henson Prods.*, No. 95 Civ. 5473 (KMW), 1995 U.S. Dist. LEXIS 13886, at *20 (S.D.N.Y. Sept. 22, 1995), *aff'd*, 73 F.3d 497 (2d Cir. 1996) (While misspellings of defendant's mark in newspaper articles about defendant's movie and the script of a CD-

ROM game being produced by one of defendant's licensees were "proof of some confusion as to the spelling and pronunciation of the character's name, they [we]re not proof of any confusion over [plaintiff's] sponsorship of, or association with, the character."); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 263 (4th Cir. 2007) (misspellings of defendant's mark on invoices and order forms were "far more likely in [the] context to indicate confusion over how to spell the product name than any confusion over the source or sponsorship of the [defendant's product]").

26. Courts have uniformly found that automated Internet search engine results, which are produced by proprietary algorithms and then-present web content, are not evidence of actual confusion. *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166 (2d Cir. 2004) (holding that "the fact that the computer [search engine] associates [plaintiff's mark] with [defendant's mark] reflects little, if anything, about whether consumers are actually confused"); *see also Sullivan v. CBS Corp.*, 385 F.3d 772, 779 (7th Cir. 2004) (finding that although "[t]he search engines retrieved web sites related to both the [plaintiff] and the [defendant,] [t]his does not mean, however, that the search engine was 'confused' as to the source of the sites").

27. "While survey evidence is sometimes said to be evidence of 'actual' confusion, it is so only to the extent that the survey mirrors the real world setting which can create an instance of actual confusion." *Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*, No. 06 Civ. 550 (JFK), 2007 U.S. Dist. LEXIS 57320, at *20 (S.D.N.Y. Aug. 6, 2007) (quoting 3 McCarthy on Trademarks § 23:2.1, at 23-13 (4th ed. 2002)).

**Bad Faith**

28. In determining bad faith, courts consider whether the defendant "adopt[ed] its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 380 (S.D.N.Y. 2015) (quoting *Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2nd Cir. 1991)).

29. Failure to discontinue conduct after reception of a cease and desist letter alone is insufficient to support an allegation of bad faith. *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 427 (S.D.N.Y. 2008); *see also Wonder Labs, Inc. v. Procter & Gamble Co.*, 728 F. Supp. 1058, 1064 (S.D.N.Y. 1990) (failure to abort advertising campaign upon receipt of cease and desist letter "is absolutely no proof that the defendant acted in bad faith to capitalize on the plaintiff's trademark").

**Quality of the Products**

30. Courts take different views regarding the significance of the quality of the products. "One view is that an inferior quality product produced by the junior user injures the senior user's reputation insofar as consumers might think that the source of the inferior product is the senior user. Another view is that a junior user's product of equal quality to a senior user's product injures the senior user by the increased tendency of similar quality products to promote consumer confusion." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988) (internal citations omitted).

**Sophistication of Consumers**

31. Courts have held that fashion-conscious retail clothing consumers exercise a high degree of care in purchasing and are considered sophisticated. *See Kookai, S.A. v. Shabo*, 950 F.

Supp. 605, 609 (S.D.N.Y. 1997) (holding that "retail purchasers are more sophisticated and are not as likely to be confused by similar marks," and, specifically, fashion-conscious shoppers "are likely to exercise a significant degree of care in purchasing their clothing, since the name of the particular designer is important in the fashion world"); *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137–38 (2d Cir. 1979) (holding that the trial court did not abuse its discretion in deciding that purchasers of women's sportswear were "sophisticated and knowledgeable").

## C.   SURVEYS

32. To assess the evidentiary value of survey evidence, the court should consider a number of criteria, including: "[1] whether the proper universe was examined and the representative sample was drawn from that universe; [2] whether the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; [3] whether the questions were leading or suggestive; [4] whether the data gathered was accurately reported; and [5] whether persons conducting the survey were recognized experts."  *1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467, 499 (S.D.N.Y. 2003).

### 1.   SURVEY UNIVERSE

33. The selection of a proper survey universe is critically important in assessing the validity of a survey because "the persons interviewed must adequately represent the opinions which are relevant to the litigation."  *Vista Food Exch., Inc. v. Vistar Corp.*, No. 03-CV-5203 (DRH) (WDW), 2005 U.S. Dist. LEXIS 42541, at *18 (E.D.N.Y. Sept. 27, 2005) (internal quotations omitted); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 630 (S.D.N.Y. 2007) ("A 'universe' is that segment of the

population whose perceptions and state of mind are relevant to the issues in the case.")
(internal quotations omitted).

34. Where a survey fails to represent the universe it is intended to reflect, its probative value
is reduced. *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307–08 (S.D.N.Y. 2001).

35. In cases of forward confusion, the proper universe to survey is the "potential purchasers
of the junior user's product." *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands,
Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002).

## 2.   SURVEY FORMAT

36. "[T]he principal question" in determining the appropriate survey format "is whether
either survey, if not both, sufficiently simulated the actual marketplace conditions in
which consumers encountered the parties' products so as to be a reliable indicator of
consumer confusion." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 232 (S.D.N.Y.
2010).

37. The lineup methodology is inadmissible where the goods at issue could not be found in
the same stores as it does not "sufficiently approximate the manner in which consumers
encountered the parties' products in the marketplace." *THOIP v. Walt Disney Co.*, 690 F.
Supp. 2d 218, 236 (S.D.N.Y. 2010); *see also Kargo Global, Inc. v. Advance Magazine
Publrs., Inc.*, No. 06 Civ. 550 (JFK), 2007 U.S. Dist. LEXIS 57320, at *21–22 (S.D.N.Y.
Aug. 6, 2007) (criticizing the lineup survey for failing to reflect marketplace conditions
where, among other things, the plaintiff "offered no data or other evidence to support the
proposition that prospective consumers were likely to encounter Kargo's trademark a
short time after seeing *Cargo* magazine" because "the Court doubt[ed] that a non-

negligible number of prospective consumers of Kargo's products would

see *Cargo* magazine, followed a minute or less later, by the KARGO logo").

38. "When ascertaining whether a survey methodology sufficiently simulates marketplace

conditions, the focal point must be the specific products tested by the survey." *THOIP v.*

*Walt Disney Co.*, 690 F. Supp. 2d 218, 236–37 (S.D.N.Y. 2010) ("[N]otwithstanding that

many of the same retailers sold THOIP and Miss Disney shirts, and despite the evidence

that Disney shirts are at times sold side-by-side non-Disney shirts, such general

information does not justify" the choice of a lineup survey where the specific pairs of

shirts that THOIP's expert tested were never sold in the same retail locations.).

39. Courts have accepted in evidence Eveready surveys where the senior mark at issue was

not especially well-known, namely GO SMILE and OWN YOUR POWER. *See, e.g.*,

*GoSmile, Inc. v. Levine*, 769 F. Supp. 2d 630, 642–43 (S.D.N.Y. 2011) (Eveready survey

of "Go Smile" mark); *Kelly-Brown v. Winfrey*, 95 F. Supp. 3d 350, 362 (S.D.N.Y. 2015)

(Eveready survey of "Own Your Power" mark).

### 3.   SURVEY STIMULUS

40. "[A] survey must use the proper stimulus, one that tests for confusion by replicating

marketplace conditions." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.

2d 558, 591 (S.D.N.Y. 2007) (quoting *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d

242, 253 (S.D.N.Y. 1999)).

41. The probative value of a survey is minimized where its stimulus fails to simulate how

consumers would view the products in the marketplace. *Louis Vuitton Malletier v.*

*Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591–92 (S.D.N.Y. 2007); *see, e.g.*, *Vista*

*Food Exch., Inc. v. Vistar Corp.*, No. 03-CV-5203 (DRH) (WDW), 2005 U.S. Dist.

LEXIS 42541, at *15–16 (E.D.N.Y. Sept. 27, 2005) (finding that "by focusing on the words 'Vista' and 'Vistar' alone," and not as they are used in commerce, "the survey failed to replicate actual marketing conditions and improperly skewed results in favor of responses indicating confusion").

42. "A survey that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591 (S.D.N.Y. 2007); *see, e.g.*, *Am. Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (finding defendant's survey defective for "failure to conduct it under actual marketing conditions," as "the [promotional] poster always was shown in an environment replete with references to [plaintiff] as the seller of the [product]," but not in the survey).

### 4.    SURVEY CONTROL

43. "In designing a control group study, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 595 (S.D.N.Y. 2007) (quoting Shari Seidman Diamond, Reference Guide on Survey Research, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 258 (Federal Judicial Center 2000)).

44. "A control stimulus is used in trademark surveys to 'sufficiently account for factors legally irrelevant to the requisite confusion,' such as the 'background noise.'" *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 595 (S.D.N.Y. 2007) (quoting *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 574–75 (E.D.N.Y. 1999)).

45. "Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010).

### 5. SURVEY QUESTIONS

46. "A survey is not credible if it relies on leading questions which are 'inherently suggestive and invite guessing by those who did not get any clear message at all." *P&G Pharms., Inc. v. Hoffmann-La Roche, Inc.*, No. 06 Civ. 0034 (PAC), 2006 U.S. Dist. LEXIS 64363, at *86 (S.D.N.Y. Sept. 6, 2006) (citing *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 (3rd Cir. 1994)).

47. "[T]he back-to-back presentation of the parties' marks, followed by questions that asked respondents if they believed the marks were related, suggested to respondents that they should believe that a connection existed between the companies' marks." *Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*, No. 06 Civ. 550 (JFK), 2007 U.S. Dist. LEXIS 57320, at *26 (S.D.N.Y. Aug. 6, 2007) (emphasis in original).

48. Questions posed as to the source of the product are leading and suggestive if they imply the answer to the ultimate question the survey was designed to test. *Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*, No. 06 Civ. 550 (JFK), 2007 U.S. Dist. LEXIS 57320, at *26 (S.D.N.Y. Aug. 6, 2007).

49. "[T]he question about whether the two [non-competing] items are put out by the same or a related source is likely to generate so-called 'demand effects' that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items." *Kargo Global, Inc.*

*v. Advance Magazine Publrs., Inc.*, No. 06 Civ. 550 (JFK), 2007 U.S. Dist. LEXIS 57320, at *25 (S.D.N.Y. Aug. 6, 2007).

### 6.   SURVEY CODING

50. Confusion caused by factors irrelevant to the mark at issue should be disregarded in determining confusion.  *See Malaco Leaf AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 375 (S.D.N.Y. 2003) (finding Plaintiff's survey to have no probative value for, *inter alia*, "attribut[ing] the balance of the reported, confusion (8%) to other indicia of confusion which are irrelevant to this Court's trade dress analysis, including, *inter alia*, consumers' belief that both products are the 'same type of candy'"); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 573–75 (E.D.N.Y. 1999) (determining that numerous survey respondents' verbatim responses showed that these respondents' confusion was caused by factors not relevant to the trade dress at issue).


Dated:   New York, New York              Respectfully submitted,
         July 22, 2016

                                         By  _/s/ Anthony F. Lo Cicero_____
                                             Anthony F. Lo Cicero
                                             Richard S. Mandaro
                                             Reena Jain
                                             AMSTER, ROTHSTEIN & EBENSTEIN LLP
                                             90 Park Avenue
                                             New York, NY  10016
                                             Tel:  (212) 336-8100
                                             Fax:  (212) 336-8001


                                             *Attorneys for Defendant Macy's*
                                             *Merchandising Group, Inc.*