UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
JOULES LIMITED,

                Plaintiff,                          15-CV-3645 (KMW)

                                                       **OPINION & ORDER**

-against-


MACY'S MERCHANDISING GROUP
INC,

                Defendant.
------------------------------------------------------X

KIMBA M. WOOD, United States District Judge:

        In 2015, Plaintiff Joules Limited ("Joules") commenced this action against Defendant

Macy's Merchandising Group, Inc. ("MMG"), asserting claims of trademark infringement under

federal and state law, and unfair competition under federal law, based on Defendant's use of the

mark "Maison Jules" in connection with the sale of women's clothing. Plaintiff argues that this

mark is confusingly similar to its own registered "Joules" mark, which is also used in connection

with the sale of, *inter alia*, women's clothing. Defendant has counterclaimed, seeking a

declaratory judgment that its "Maison Jules" mark is non-infringing.

        In July 2016, the Court held a two-day bench trial. As set forth in the following findings

of fact and conclusions of law, the Court holds that Joules has failed to show that there is a

likelihood of confusion between the "Joules" and "Maison Jules" marks, and therefore has failed

to carry its burden on any of its claims.

## I.    FINDINGS OF FACT

        After considering the evidence admitted during trial, the Court makes the following

findings of fact.

A. <u>The Parties</u>

1.      Plaintiff Joules is a limited liability company, headquartered in England. (Stipulation of Fact 10, [Doc. No. 72]). Joules is owned by Joules Group PLC, shares of which are publicly traded on the London Stock Exchange. *Id.*

2.      Joules is a retail seller of men's and women's clothing and accessories, whose products are available in a number of countries throughout the world, including the United States. (Stipulation of Fact 10; Joule Aff. ¶ 1).

3.      Defendant MMG is a New York corporation and wholly owned subsidiary of Macy's, Inc. ("Macy's"). (Stipulation of Fact 11). Macy's operates department stores throughout the United States, and also sells goods on its website, www.macys.com. (Stipulation of Fact 12). Macy's is not a party to this lawsuit. (First Amended Complaint ("FAC"), [Doc. No. 34]).

4.      MMG is responsible for developing and producing "private brands" for Macy's. (Stipulation of Fact 13). "Private brands" are clothing lines that are designed and manufactured specifically for Macy's and sold almost exclusively at Macy's brick-and-mortar stores and at www.macys.com. (Trial Tr. 139:10-16). Private brands are often contrasted with "market brands," which are purchased by Macy's from outside companies that have no association with Macy's, e.g., Ralph Lauren. (Brandefine Aff. ¶ 3; Trial Tr. 139:13-16). "Maison Jules" is a private brand line of women's clothing developed for Macy's by MMG. (Brandefine Aff. ¶ 3; Trial Tr. 136:1-2).

B. <u>The Trademarks at Issue</u>

5.      Joules owns U.S. Trademark Registration No. 3,696,021, issued on October 13, 2009, for the mark JOULES for use in connection with, *inter alia*, women's clothing, footwear,

and accessories. (Stipulation of Fact 14, Ex. P97). This registration was renewed in 2015. (Stipulation of Fact 19; Ex. P238).

6.     The United States Patent and Trademark Office ("USPTO") registered the JOULES mark without requiring a showing of secondary meaning, pursuant to Section 2(f) of the Trademark Act. (Ex. P97).

7.     Since 2004, the JOULES mark has appeared in the marketplace primarily in the stylized script shown below. (Joule Aff. ¶ 9).



This script logo is based on the handwriting of Mr. Tom Joule, the founder and Chief Brand Officer of Joules. (Joules Aff. ¶ 1; Trial Tr. 17:15-25). Joules uses this script version of its mark on the Joules websites, www.joules.com and www.joulesusa.com, and on product hangtags and neck labels. (Joules Aff. ¶ 9; Exs. P107, P109, P150, P151). This script logo often appears within a colored rectangular box. (Trial Tr. 20:13-25; Exs. P109, P113, P151).

8.     On November 14, 2012, MMG filed an intent-to-use trademark application with the USPTO, seeking registration of the mark MAISON JULES in connection with various goods, including women's clothing. (Stipulation of Fact 20; Ex. D78).

9.     On December 19, 2013, the USPTO issued an Office action regarding MMG's application, which stated that the examiner found no conflicting marks that would bar registration of MAISON JULES under Trademark Act § 2(d). (Ex. D80). On July 31, 2013, the USPTO issued a Notice of Publication for the MAISON JULES mark, and the mark was subsequently published. (Ex. D82).

10.     Defendant introduced evidence at trial of a number of third-party trademark registrations and websites that use "Jules" or a homophone thereof in connection with the sale of women's clothing and accessories. (Ex. D2 ¶¶ 28-80).

| Third Party Trademarks and Registrations | Relevant Goods and Services |
| --- | --- |
| U.S. Trademark Registration No. 3,118,852 for JULES JURGENSEN | Wrist watches |
| U.S. Trademark Registration No. 3,544,128 for FRANKIE & JULES | Clothing and retail women's apparel stores |
| U.S. Trademark Registration No. 3,551,077 for SANJULES | Tops, bottoms, shirts, jackets, pants, shorts, underwear, scarves, and headwear |
| U.S. Trademark Registration No. 3,633,534 for BAG OF JULES | Shoe bags for travel, tote bags, and sports bags |
| U.S. Trademark Registration No. 3,639,856 for JULES VERNE | Jewelry, watches |
| U.S. Trademark Registration No. 3,661,658 for JULES SMITH | Jewelry |
| U.S. Trademark Registration No. 3,818,472 for JULES SAINTE ROSE | Jewelry, leather goods, and clothing |
| U.S. Trademark Registration No. 4,210,628 for JULES + JAMES | Watches |
| U.S. Trademark Registration No. 4,293,439 for JULES K. | Women's clothing |
| U.S. Trademark Registration No. 4,293,439 for 'JÜEL | Dresses, hats, headwear, hooded sweatshirts, jackets, pants, shirts, shoes, shorts, skirts, sleeping garments, socks, sweaters, sweatpants, sweatshirts, t-shirts, tank tops, under garments |

| U.S. Trademark Registration No. 4,455,800 for JULES & LEOPOLD | Blazers, blouses, coats, dresses, pants, skirts, tops, vests, sweaters |
|---|---|
| U.S. Trademark Registration No. 4,496,359 for JEANS JULES | Fashion accessory items |
| U.S. Trademark Registration No. 4,614,699 for JULES B. | Jewelry |
| U.S. Trademark Registration No. 4,671,943 for JULES FRANCOIS CRAHAY | Clothing |
| U.S. Trademark Registration No. 4,733,279 for D JOOLS | Ankle socks, athletic pants, athletic shorts, briefs, graphic t-shirts, gym pants, hats, hood sweatshirts, jackets, etc. |
| Bella Jules, www.bellajulesboutique.com | Women's clothing |
| Jules Boutique, www.jules-boutique.com | Women's clothing |
| Jules D., www.jules-d.com | Men's clothing |
| Jules Etc. Boutique, www.julesetcboutique.com | Jewelry and women's clothing |
| Jules, www.julesjewelry.com | Jewelry |
| Jules, www.julesnj.com | Jewelry |
| Pink Jules, www.pinkjulesboutique.com | Women's Clothing |

C.  Joules' Business

11.     Joules merchandise has been available in the United States since at least 2001; sales have increased dramatically in the last four years. (Joule Aff. ¶¶ 30-31; Wood Aff. ¶ 11; Trial Tr. 4:20-24).

12.     Joules offers a line of women's clothing, shoes, and accessories that targets customers between the ages of 25 and 40. (Stipulation of Fact 18; Joule Aff. ¶ 25). This line of clothing is intended to be fashionable enough to wear in the workplace, but also casual enough to wear on the weekend. (Joule Aff. ¶ 25). Rain boots and rainwear are prominent components of

the Joules women's line, and have been the subject of unsolicited media coverage. (Trial Tr. 10:21-13:12, 60:3-24)

13.     Joules' strategy for growth in the United States is first to promote its rain boots and rainwear, thereby developing brand recognition and good will, and then introduce its clothing and accessories to the same buyers. (Trial Tr. 10:21-13:12, 60:3-24). Many of the large national retailers who carry Joules products in their stores carry only Joules' rain boots or rainwear. (Ex. D2).

14.     Joules products are available in the stores of large national retailers, including Von Maur and Nordstrom, and in stores owned by a number of smaller independent retailers, who purchase Joules goods through two distributors, Frantisi and The Madgin Group. (Wood Aff. ¶¶ 12-13, 15; Joules Aff. ¶¶ 10, 17).

15.     Joules merchandise is also available in the United States through its U.S. website, www.joulesusa.com, which was launched in 2010, (Stipulation of Fact 16; Joule Aff. ¶¶ 12, 28; Wood Aff. ¶ 16; Trial Tr. 286:8-11), as well as through third-party online retailers, including Target.com and Amazon.com, (Wood Aff. ¶ 12-13; Trial Tr. 63:2-9).

16.     Joules has no retail stores in the United States. (Joule Aff. ¶ 16). Joules products are not sold in Macy's brick-and-mortar stores or on www.macys.com. (Stipulation of Fact 47).

   D.  The Maison Jules Clothing Line

17.     "Maison Jules" is a private brand line of women's clothing developed for Macy's by MMG that targets millennial female consumers between the ages of 18-30. (Brandefine Aff. ¶¶ 3, 16; Trial Tr. 136:1-2, 181:11-21, 201:19-23). The line is influenced by Parisian and French style, and is intended to be dressy enough to wear to work, but also casual enough to wear on the weekend. (Brandefine Aff. ¶¶ 22-27; Trial Tr. 150:11-12).

18.     The Maison Jules line does not include footwear. (Trial Tr. 13:18-23).

19.     The Maison Jules line of clothing is of approximately the same quality as Joules' line of women's clothing, and the two lines are priced comparably. (Stipulations of Fact 28, 29).

20.     The Maison Jules clothing line was launched in July 2013. It was initially available for purchase in approximately 150 Macy's department stores, and, starting in August 2013, online at www.macys.com. (Stipulation of Fact 26; Brandefine Aff. ¶¶ 20, 45-46).

21.     Maison Jules apparel is sold primarily at Macy's brick-and-mortar stores and at www.macys.com. (Brandefine Aff. ¶¶ 45, 63; Trial Tr. 132:5-17). Maison Jules products are also available for purchase in a small number of military exchange stores. Sales at these stores make up a very small percentage of sales of Maison Jules products (less than 1%). (Brandefine Aff. ¶ 45; Trial Tr. 132:20-25).

22.     In addition, a limited number of Maison Jules products are available for sale on third-party websites, such as Amazon.com. (Urban Aff. ¶¶ 6-7). These are typically out-of-season or damaged pieces that have been marked down multiple times. (Trial Tr. 177:24-178:9, 134:12-23). MMG does not sell these items directly to Amazon.com. (Trial Tr. 175:16-21). Rather, these items are typically sold by third-party liquidators, who purchase unsold Maison Jules items alongside other clearance merchandise from another Macy's entity, called Macy's Logistics & Operations. (Urban Aff. ¶¶ 6-7; Trial Tr. 177:24-178:9).

23.     Maison Jules products are not available for sale on www.joules.com or www.joulesusa.com. (Stipulation of Fact 46).

24.     The "Maison Jules" name was chosen by MMG's marketing team for a variety of reasons. "Maison" was chosen to create an association with French fashion. (Brandefine Aff. ¶ 32; Trial Tr. 202:4-12, 203:9-19; Ex. D23). "Maison" means house in French and is frequently

used to refer to French fashion houses. (Stipulation of Fact 27). "Jules" was chosen in part because the name is dual gender (which would allow the brand to expand into men's apparel in the future), and because of its association with the popular French film, "Jules and Jim." (Brandefine Aff. ¶ 33; Trial Tr. 148:13-22; Ex. D23). "Maison Jules" was also chosen because it is easy for Americans to pronounce, and was unlike any other name used for a Macy's private brand targeting millennial customers. (Brandefine Aff. ¶ 33; Trial Tr. 149:3-14; Ex. D23).

25.     In conjunction with the selection of the "Maison Jules" name, the MMG marketing team created a logo for the brand, as shown below:



This is how the Maison Jules name appears on garment hangtags and neck labels, on the Maison Jules section of the Macy's website, and on physical objects—such as hangers, mannequins, and wall plaques—that are part of the Maison Jules display section in Macy's brick-and-mortar stores. (Exs. D29, D30, D43).

26.     After selecting the name "Maison Jules," MMG performed a trademark search, dated August 28, 2012, to identify any conflicting trademarks. (Stipulation of Fact 21; Ex. D24). This trademark search returned a result for Joules' U.K. webpage, http://www.joules.com/en-GB/Homepage.action, but did not return any results for Joules' U.S. webpage, www.joulesusa.com. (Ex. D24; Trial Tr. 286:21-287:8).

E.   The Present Dispute

27.     Joules first became aware of the MAISON JULES trademark in December 2012 through a trademark watching service. (Stipulation of Fact 22).

28.     In February 2013, Joules, through its U.K. trademark attorneys, sent a cease-and-desist letter to Macy's European trademark attorneys in Germany, requesting that Macy's withdraw the U.S. trademark application for MAISON JULES. (Stipulation of Fact 23). Joules received no response. (Joule Aff. ¶ 35).

29.     Joules then sent a cease-and-desist letter to MMG's U.S. trademark counsel in April 2013. (Stipulation of Fact 24). MMG's U.S. counsel responded to this letter a few days later, denying any potential for confusion. (Stipulation of Fact 25).

30.     In January 2014, Joules filed a Notice of Opposition to the MAISON JULES trademark application pending before the USPTO, alleging that the MAISON JULES mark should not be registered because of a likelihood of confusion with the JOULES trademark. (Joule Aff. ¶ 37).

31.     Joules filed the present action on May 11, 2015. (Stipulation of Fact 30). The opposition proceeding before the USPTO has been stayed pending the outcome of this action. (FAC ¶ 21 n.3).

F.  Expert Surveys on Likelihood of Confusion

32.     Both parties retained experts to design and implement surveys to assess the likelihood of consumer confusion between the JOULES mark and the MAISON JULES mark. (Ex. P75; Ex. P45). Plaintiff retained expert Dr. Michael Belch to conduct its survey. (Ex. P75). Defendant retained expert Hal Poret to conduct its survey. (Ex. P45).

a.  Dr. Belch's Survey

33.     Plaintiff's expert Dr. Belch used a modified lineup survey to test confusion between JOULES and MAISON JULES. (Belch Aff. ¶ 6). In this survey, Dr. Belch presented respondents with a screen grab of the Joules webpage, with a modified screen grab of the Maison

Jules section of the Macy's webpage that did not include the Macy's name or URL, and with a screen grab of a control webpage, in this case the webpage for the clothing brand "Michael Stars." (Belch Aff. ¶¶ 6, 22; Poret Aff. ¶ 17; Ex. P78; Trial Tr. 81:10-12). Dr. Belch randomized the order in which the Maison Jules stimulus and Michael Stars stimulus were presented, to prevent order bias. (Belch Aff. ¶ 22; 82:22-83:4). Dr. Belch then asked a series of questions to determine if the respondent thought the brands depicted were the same or affiliated, or if one brand had permission from the other to use its name. (Belch Aff. ¶ 7).

34.     Dr. Belch selected the Michael Stars page as his control after considering three possibilities suggested by the daughter of his wife's friend. (Trial Tr. 83:15-84:2). The other possibilities were "Nasty Girl" and a site whose name Dr. Belch could not recall. (Trial Tr. 83:21-85:13).

35.     Dr. Belch selected respondents who were women between the ages of 16 and 35, and who had shopped for clothing online or in a department store within the past year. (Belch Aff. ¶¶ 17, 19). Dr. Belch had 308 respondents to his survey. (Belch Aff. ¶ 20). Dr. Belch did not limit his universe to respondents who had shopped at Macy's. (Trial Tr. 91:24-92:1).

36.     Dr. Belch found that 16.2% of respondents had seen, heard of, or purchased merchandise from Joules. (Trial Tr. 87:2-8).

37.     Dr. Belch found that 24.3% of respondents believed that JOULES and MAISON JULES products were made by the same company or owned by the same company, after accounting for "noise" attributable to the survey format, as measured by the third-party control brand. (Belch Aff. ¶ 9).

###### b. *Mr. Poret's Survey*

38.    Defendant's expert Mr. Hal Poret used an *Eveready* survey to test confusion between JOULES and MAISON JULES. (Poret Aff. ¶ 38). In this survey, Mr. Poret showed respondents images of the MAISON JULES mark as it appears either on the www.macys.com webpage or in a Macy's brick-and-mortar store. (Poret Aff. ¶¶ 48, 51-71). Mr. Poret then asked a series of standard questions to determine if any respondents believed that the Maison Jules products were made by, affiliated with, or authorized by Joules. (Poret Aff. ¶¶ 72-87). An *Eveready* study does not prompt respondents with the senior user's mark (in this case, JOULES) before asking if the respondent believes that the products branded with the junior user's mark (here, MAISON JULES) are made by, affiliated with, or authorized by the senior user. (Poret Aff. ¶ 38).

39.    Mr. Poret selected respondents to mirror the universe used in Dr. Belch's study. (Poret Aff. ¶ 42; Trial Tr. 244:19-245:2). However, Mr. Poret limited his universe in one way that Dr. Belch did not: he disqualified those who had never shopped at Macy's, either in store or online, or who did not intend to shop at Macy's within the next six months. (Poret Aff. ¶ 43, Trial Tr. 261:6-13, 263:23-264:12). Mr. Poret had 800 respondents to his survey. (Poret Aff. ¶ 37; Trial Tr. 253:16).

40.    Based on the respondents' answers to the standard questions regarding ownership, affiliation, and authorization, as well as to qualitative open-format follow-up questions, Mr. Poret concluded that only 0.1% of respondents (1 out of 800) might confuse the MAISON JULES and JOULES marks. (Poret Aff. ¶ 36).

## II.    LEGAL FRAMEWORK

To prevail on a claim of trademark infringement under federal or state law, Plaintiff Joules must show (1) that it owns a valid protectable trademark; (2) that Defendant MMG used the mark in commerce in connection with the sale of goods or services and without Joules' consent; and (3) that there was a likelihood of consumer confusion. *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005); *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 541 (S.D.N.Y. 2012) (Engelmayer, J.).

Similarly, to prevail on a claim of unfair competition or false designation of origin under federal law, Plaintiff must show (1) that it owns a protectable trademark; (2) that Defendants used the mark in commerce without consent; and (3) that the use of the mark is likely to confuse consumers as to the source or sponsorship of the products. *See Nespresso USA, Inc. v. Africa Am. Coffee Trading Co. LLC*, No. 15-CV-5553, 2016 WL 3162118, at *6 (S.D.N.Y. June 2, 2016) (Swain, J.).

Courts in the Second Circuit evaluate the likelihood of confusion by weighing the eight factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 493 (S.D.N.Y. 2015) (Preska, J.). These factors are:

(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will "bridge the gap" between the two markets; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the purchasers.

*Id.* (citing *Polaroid*, 287 F.2d at 495). These factors are to be weighed holistically. The inquiry "is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (quoting *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993)).

## III.    CONCLUSIONS OF LAW

Defendant MMG does not dispute that Joules has a valid and protectable mark and that MMG used the MAISON JULES mark without Joules' consent. Accordingly, the central issue at trial was the likelihood of consumer confusion between the two marks.

After assessing the eight *Polaroid* factors, discussed below, the Court concludes that the balance weighs in favor of Defendant MMG. Of particular importance to the Court's conclusion are the factors regarding the strength of the mark, the existence of actual confusion, and the competitive proximity of the products, all of which weigh decisively in favor of MMG.

### A.  Strength of the Mark

"The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998) (citing *McGregor-Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979)). In assessing the strength of a mark, courts must consider two forms of distinctiveness: (1) inherent distinctiveness, and (2) distinctiveness in the marketplace. *Id.* at 743-44. The JOULES mark is entitled to a presumption that it is inherently distinctive, because it was registered by the USPTO without proof of secondary meaning. *See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999);

13

*Heisman Trophy Trust v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 326 (S.D.N.Y. 2009) (Marrero, J.).

However, this inherent distinctiveness is undercut by the weakness of the JOULES mark in the marketplace. Joules' own expert, Dr. Belch, determined that only 16.2% of consumers in the target audience for the products had ever heard of Joules. (Trial Tr. 87:2-87:6). And this figure is likely to be a high estimate, because the Belch survey respondents were first prompted with an image displaying the JOULES mark before being asked if they had ever heard of the brand. As Defendant's expert, Mr. Poret, explained, if respondents had been asked to recall the name JOULES unaided, the number would likely be even lower. (Trial Tr. 87:2-11, 251:17-252:10).

The distinctiveness of the JOULES mark in the marketplace is further weakened by the existence of a number of other trademark registrations and websites that use "Jules" or a homophone thereof in connection with the sale of women's clothing and accessories. (Ex. D1 ¶¶ 28-80). The presence of a number of similar third-party marks in the same industry severely weakens a given mark's distinctiveness in the marketplace. *See Dana Braun, Inc. v. SML Sport Ltd.*, No. 03-CV-6405, 2003 WL 22832265, at *9-10 (S.D.N.Y. Nov. 25, 2003) (Jones, J.) (finding that "Sarah Arizona" mark lacked strength in the marketplace where numerous other marks used on similar clothing incorporated the name "Sarah" or "Sara"); *see also Streetwise Maps*, 159 F.3d at 744; *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 698-99 (S.D.N.Y. 1999) (Motley, J.), *aff'd sub nom. Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43 (2d Cir. 2000). Courts often find that a mark is non-infringing, "where the common word between the two marks is used by many parties, in other words, where there is a 'crowded field.'" *Dana Braun*, 2003 WL 22832265, at *9.

14

Accordingly, the Court finds that this factor weighs in favor of MMG.

B.  Similarity of the Marks

"When evaluating the similarity of marks, courts consider the overall impression created by a mark." *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 587 (S.D.N.Y. 2015) (Forrest, J.) (quoting *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004)). In making this assessment, courts consider different forms of similarity—such as similarity of meaning, appearance, or sound—as well as the context in which the marks are displayed in the marketplace. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006); *Flushing Bank*, 138 F. Supp. 3d at 587 (in assessing similarity, courts should consider "mode of presentation, typeface, inclusion of additional words, dress colors, and associated tie-ins, such as a mascot," among other factors).

In assessing the similarity between the JOULES and MAISON JULES marks, the Court considers each mark as a whole. *See Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 215 (2d Cir. 2003) (a composite mark should be considered as a whole); *Playtex Prods. Inc. v. Georgia Pacific Corp.*, 390 F.3d 158, 164-65 (2d Cir. 2004) (in trademark infringement suit between "Wet Ones" and "Moist Ones," court did not disassemble marks to make comparison but rather made its determination based on each mark in its entirety).

Based on this assessment, the Court concludes that the marks are more dissimilar than similar. Although the script used in the "Jules" portion of the MAISON JULES mark is similar to that used in the JOULES mark, the MAISON JULES mark is two words, rather than one, and is used only in its composite form. *See* (Exs. D23, D29, D30, D43). Joules has provided no examples of MMG ever using the singular "Jules" without "Maison."  The Court notes that the inclusion of "Maison" does little to distinguish the *meaning* of the two marks, since "Maison" is

15

frequently used to refer to fashion houses, particularly in France. (Trial Tr. 35:18-22; 202:20-22).

Nonetheless, the composite MAISON JULES mark is easily distinguished from JOULES based

both on its sound—particularly because the dissimilar word is first—and its appearance.

Thus, on balance, this factor weighs in favor of MMG.

C.  Competitive Proximity

"The 'proximity-of-the-products' inquiry concerns whether and to what extent the two

products compete with each other." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d

Cir. 1996). In making this determination, a court should look to "the nature of the products

themselves," and to "the structure of the relevant market." *Id.* (quoting *Vitarroz Corp. v. Borden,

Inc.*, 644 F.2d 960, 967 (2d Cir 1981)).

Although there is an overlap in the target consumer for the two brands—both target

women in their twenties—Joules and Maison Jules products almost never compete directly in the

marketplace. The products are not sold in any of the same brick-and-mortar stores: Joules

products are not offered for sale at Macy's, and Maison Jules products are not sold by any

department stores or independent retailers who carry Joules products. (Stipulation of Fact 47;

Trial Tr. 21:1-20; Brandefine Aff. ¶ 45). Joules products are not sold at www.macys.com and

Maison Jules products are not sold at www.joules.com or www.joulesusa.com.  (Stipulation of

Fact 46, 47; Trial Tr. 21:1-4, 72:14-20). Joules has identified only two online locations where

Joules and Maison Jules products are available through the same website: (1) Amazon.com,

which sells vast numbers of products, and (2) the "Sears & Marketplace" tab of the Sears.com

website, which displays hundreds of items sold by third parties (the products do not appear under

the "Sears only" tab of the website). (Trial Tr. 21:16-18, 74:5-8, 75:8-10; Ex. P232; Stipulations

16

of Fact 41-45). These online sales at third-party websites represent only a tiny fraction of sales of

Maison Jules merchandise. (Trial Tr. 178:19-179:14).

In addition, a significant percentage of Joules sales in the United States are for rain boots

and rainwear, and the majority of large national retailers who carry Joules products—including

Nordstrom, Target, and Lord & Taylor—carry no Joules products other than rain boots or

rainwear. (Ex. D2). By contrast, the Maison Jules line does not include footwear or rainwear.

(Trial Tr. 13:18-23).

Accordingly, the Court finds that this factor weighs clearly in favor of MMG.

D.   Actual Confusion

Though a plaintiff need not provide proof of actual consumer confusion in order to

prevail on a claim of trademark infringement, *Savin Corp. v. Savin Group*, 391 F.3d 439, 459 (2d

Cir. 2004) (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d

Cir. 1986)), evidence of actual consumer confusion provides strong support for a finding of a

likelihood of confusion, *id.* (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*,

438 F.2d 482, 489 (5th Cir. 1971)). However, a plaintiff must do more than point to a single

incident or a small number of incidents of actual confusion in order to prevail on this factor.

*Flushing Bank*, 138 F. Supp. 3d at 589-90 (collecting cases).

1.   *Survey Evidence*

Here, the primary evidence offered by the parties to demonstrate the existence or absence

of actual consumer confusion consists of the two expert surveys discussed above. To assess the

validity and reliability of survey evidence, a court should consider a number of factors, including

whether:

17

(1) the proper universe was examined and the representative sample was drawn from that

universe; (2) the survey's methodology and execution were in accordance with generally

accepted standards of objective procedure and statistics in the field of such surveys; (3)

the questions were leading or suggestive; (4) the data gathered were accurately reported;

and (5) persons conducting the survey were recognized experts.

*THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230-31 (S.D.N.Y. 2010) (Scheindlin, J.)

(quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415, 433 (S.D.N.Y.

2004) (Scheindlin, J.)). Overall, "the closer the survey methods mirror the situation in which the

ordinary person would encounter the trademarks, the greater the evidentiary weight of the survey

results." *Id.* at 231 (quoting 6 McCarthy on Trademarks § 32:163 at 32-333).

Applying these considerations to the surveys administered by the parties, the Court

concludes that the Belch survey suffers from several significant weaknesses that greatly limit its

value for measuring actual consumer confusion.

First, the line-up methodology chosen by Dr. Belch does not accurately reflect the

circumstances in which consumers encounter the JOULES and MAISON JULES marks in the

marketplace. The line-up format is most appropriate in situations where two marks will appear in

close proximity in the marketplace, i.e. in the same store or even on the same shelf. *See THOIP*,

690 F. Supp. 2d at 235 ("[A] sequential presentation of the two marks at issue (or array

[including controls]) is appropriate only if it reflects a significant number of real world situations

in which both marks at issue are likely to be evaluated sequentially or side-by-side."). But where,

as here, the products at issue are not sold in the same stores or, for the most part, on the same

websites, such a format may over-estimate confusion by forcing consumers to consider the marks

in close proximity in a way they would not in the marketplace. (Poret Aff. ¶¶ 20-21); *see also*

18

*Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*, No. 06-CV-550, 2007 WL 2258688, at *8 (S.D.N.Y. Aug. 6, 2007) (Keenan, J.) (criticizing a line-up survey used when the products at issue did not appear together in the marketplace because of the "great likelihood that the back-to-back presentation of the parties' marks, followed by questions that asked respondents if they believed the marks were related, suggested to respondents that they *should* believe that a connection existed between the companies' marks").[1]

Second, the Belch study used a modified version of the Maison Jules portion of the Macy's website as its stimulus. (Trial Tr. 94:9-95:9). By removing the Macy's logo and Macy's URL from the image shown to respondents, the study deprived respondents of context that they would unavoidably encounter in the actual marketplace. (Trial Tr. 94:9-95:9, 276:11-16; Poret Aff. ¶¶ 28-29; Ex. P78, D43). Like the use of the line-up format, this modification fails to replicate the real-world conditions in which consumers would view the allegedly infringing mark, and likewise undermines the validity of the study. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591-92 (S.D.N.Y. 2007) (Scheindlin, J.). The Belch study also failed to test the in-store Maison Jules environment, where it is made evident that Maison Jules is a Macy's product, and where a significant number of consumers encounter the allegedly infringing mark. (Trial Tr. 88:3-90:9).

Third, the Belch study made use of an inadequate control stimulus, namely the Michael Stars webpage. A control should be as close as possible to the stimulus being tested—in this case, the Maison Jules webpage—except for the allegedly infringing feature. (Trial Tr. 83:7-13;

---

[1] The line-up method is inappropriate even where there are isolated instances where the marks appear side-by-side, because the survey needs to replicate the conditions in which the consumer would *ordinarily* encounter the two marks. *See, e.g.*, *THOIP*, 690 F. Supp. 2d at 235 (criticizing a line-up study for failing to replicate market conditions even if there were a small number of instances where the items might have appeared for sale in the same stores).

Poret Aff. ¶¶ 30-31, 34). But the control chosen by Dr. Belch differs in numerous ways from the Maison Jules stimulus. The name Michael Stars is neither acoustically nor semantically similar to Maison Jules. (Trial Tr. 78:19-81:22). And, although Dr. Belch contends that it was chosen for its visual similarity insofar as it depicted millennial-aged women wearing clothing, there are hundreds or thousands of websites that share these similarities. *Id.* Dr. Belch failed to identify a webpage that was sufficiently similar to the Maison Jules webpage to serve as an adequate control. *See THOIP*, 690 F. Supp. 2d at 240 ("Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology.").

Finally, the Belch study failed to limit its universe of respondents to those who had shopped at Macy's, either online or in store, or were potential Macy's customers. (Trial Tr. 91:24-92:1). In general when alleging traditional or forward confusion, i.e. that consumers will be confused into believing that a junior user's products (here, MMG's) were made by or affiliated with a senior user (here, Joules), the proper survey universe consists of the junior user's potential customers. *See Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994). Here, because Maison Jules products are available primarily at Macy's stores and www.macys.com, people who have shopped at Macy's or who are likely to become Macy's customers represent the potential customers of Maison Jules who might encounter the mark and be confused. (Trial Tr. 262:3-20).

For these reasons the Court finds that the Belch study is of extremely limited use in assessing consumer confusion, and thus gives little weight to its conclusions.

By contrast, the Court finds that the Poret survey is reliable because it more closely replicates the market conditions in which consumers would encounter the marks at issue. The

*Eveready* format used by Mr. Poret has been widely accepted in circumstances, like those here, where the two marks at issue do not appear in direct proximity in the marketplace. *See, e.g.*, *THOIP*, 690 F. Supp. 2d at 235-242 (holding that an *Eveready* survey is admissible, and a line-up survey inadmissible, because the former more accurately reflected marketplace conditions where products were not sold in the same stores); *Kargo Glob.,* 2007 WL 2258688, at *8. Mr. Poret's study also tested for confusion in both the online environment and the in-store environment, which more accurately replicates the primary ways consumers encounter the marks in the marketplace. (Trial Tr. 262:3-9; Poret Aff. ¶ 48).

At trial, Joules criticized Mr. Poret's use of an *Eveready* format on the basis that such a format is inappropriate where a mark is not widely known or recognized. (Trial Tr. 245:3-10). Joules argues that such a format is appropriate only when the senior mark has "top-of-mind" awareness, such that a large number of consumers will be able to recall it without prompting. (Trial Tr. 245:3-257:9). However, the Court finds persuasive Mr. Poret's explanation that any errors that might arise as a result of Joules' relatively low level of recognition in the marketplace are offset by his use of a large sample size for his survey. (Trial Tr. 253:13-21). By surveying 800 respondents, Mr. Poret's universe should have included approximately 100-150 respondents who had heard of Joules, based on Dr. Belch's estimate of 16.2% awareness within the target demographic. *Id.* This larger sample size thus created a "survey within a survey" to test whether consumers with awareness of Joules were confused by the MAISON JULES mark as it appeared in the marketplace. *Id.*

In light of these considerations, the Court finds that Mr. Poret's study—which found virtually no consumer confusion based on the way the MAISON JULES mark appears in the marketplace—is reliable, and supports a finding that there is an absence of confusion.

21

2.   *Other Evidence of Actual Confusion*

Plaintiff has offered no other persuasive evidence of actual confusion that would call into question the Court's conclusion based on the two expert surveys. Plaintiff has introduced evidence of isolated instances online where "Maison Jules" has been spelled as "Maison Joules." (Trial Tr. 24:17-27:9, 55:14-57:6). But Plaintiff has offered no evidence to show whether these examples were the result of actual confusion or simply misspellings by the person posting.[2] And Plaintiff has conceded that it has received no reports of actual confusion by consumers regarding the source of Maison Jules products, either directly or through its retail and distribution partners. (Trial Tr. 23:19-25, 52:19-53:11, 54:22-55:4, 64:20-65:2).

Therefore, the Court finds that this factor weighs clearly in favor of MMG.

E.   Likelihood of Bridging the Gap

"[I]f the owner of a trademark can show that it intends to enter the market of the alleged infringer, that showing helps to establish a future likelihood of confusion as to source." *Lois Sportswear*, 799 F.2d at 874. If, however, the senior user already offers products in the same market as the alleged infringer, "there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005).

As both Joules and MMG already offer women's clothing of comparable quality and price, (Stipulations of Fact 28, 29), the Court concludes that there is no gap to bridge, and that this factor is neutral.

---

[2] Even if Plaintiff could show that these websites describing "Maison Joules" products were the result of actual confusion, these few instances provide little support for a finding of actual confusion. *See Flushing Bank*, 138 F. Supp. 3d at 589.

F.  Bad Faith

"A defendant exhibits bad faith by adopting its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 380 (S.D.N.Y. 2015) (Cedarbaum, J.) (quoting *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991)) (internal quotation marks omitted).

Here, Joules has failed to show that MMG adopted its mark out of any desire to create an association with Joules or to capitalize on the good will associated with the Joules name. Instead, MMG has introduced evidence showing numerous reasons for its choice of the MAISON JULES mark for its clothing—including its association with French fashion, its gender neutrality, and its dissimilarity to other Macy's private brand names—none of which has anything to do with Joules. (Trial Tr. 147:18-149:24; Brandefine Aff. ¶¶ 28-35; Ex. D23). And MMG's performance of a trademark search prior to adopting its mark provides further evidence of its good faith. *See Flat Rate Movers*, 104 F. Supp. 3d at 380-81 (citing *Star Indus.*, 412 F.3d at 388) ("Good faith can be shown through performance of a trademark search . . . prior to adopting a mark.").[3]

Accordingly, this factor weighs in favor of MMG.

---

[3] Joules contends that MMG acted in bad faith because it launched the MAISON JULES brand after receiving a cease-and-desist letter from Joules' U.K. counsel. (Pl.'s Proposed Finding of Fact 113, [Doc. No. 77]). Although some courts have held that a Defendant acts in bad faith if s/he receives a cease-and-desist letter but continues the infringing conduct, *see, e.g., Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 600 (S.D.N.Y. 2010) (Sand, J.), others have noted that such evidence, on its own, is insufficient to establish a defendant's bad faith, *see, e.g., Wonder Labs, Inc. v. Procter & Gamble Co.*, 728 F. Supp. 1058, 1064 (S.D.N.Y. 1990) (Goettel, J.). Here, the Court finds that MMG's receipt of the cease-and-desist letter prior to launching the Maison Jules line provides little evidence of MMG's bad faith, in light of the overall dissimilarity of the marks as well as the evidence regarding the process by which MMG selected the brand name.

G.  Quality of the Defendant's Product

This factor weighs in favor of a likelihood of confusion when the products are of a similar quality. *See, e.g.*, *Plus Products v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983). Because the parties have stipulated that the Joules and Maison Jules lines of women's clothing are of comparable quality, (Stipulation of Fact 29), the Court concludes that this factor weighs in favor of Joules.

H.  Sophistication of the Purchasers

Courts generally assume that when consumers are more sophisticated, the likelihood of confusion is lower because these consumers will be more attentive and therefore more likely to notice distinctions between different marks. *See Flat Rate Movers*, 104 F. Supp. 3d at 381. In assessing the sophistication of consumers, courts will often consider (1) the expense of the products, and (2) the market conditions in which the products are sold, which might encourage or discourage impulse purchases. *See Bath & Body Works Brand Management, Inc. v. Summit Entertainment, LLC*, 7 F. Supp. 3d 385, 398-99 (S.D.N.Y. 2014) (Daniels, J.).

MMG has introduced evidence that its consumers are attentive to detail in their purchasing decisions, (Trial Tr. 182:13-15), and courts have previously noted that purchasers of women's clothing are relatively sophisticated consumers, *see, e.g.*, *Kookai, S.A. v. Shabo*, 950 F. Supp. 605, 609 (S.D.N.Y. 1997) (Motley, J.) (noting that shoppers who purchase clothing are attentive to detail, because "the name of the particular designer is important in the fashion world"); *McGregor-Doniger*, 599 F.2d at 1137-38 (purchasers of women's sportswear were "sophisticated and knowledgeable"). However, both Joules' and MMG's products are relatively inexpensive within the universe of women's fashion, (Trial Tr. 182:7-10; Stipulation of Fact 28),

and thus consumers of these products are likely to be somewhat less discerning than consumers of more expensive apparel.

Accordingly, the Court concludes that this factor is neutral.

In sum, when the above factors are considered together, the Court finds that they weigh clearly in favor of MMG. Joules has failed to show that there is a likelihood of confusion between its JOULES mark and the MAISON JULES mark used by MMG.[4]

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has failed to satisfy its burden on all of its claims. The Court GRANTS Defendant's request for a declaration that its MAISON JULES mark does not infringe the JOULES trademark (U.S. Trademark Registration No. 3,696,021). The Clerk of the Court shall enter judgment for Defendant and close this case.

SO ORDERED.

Dated: New York, New York
       August 2, 2016

_____
/s/
KIMBA M. WOOD
United States District Judge

---

[4] The Court draws additional support for this conclusion from the USPTO examiner's preliminary determination that there were "no conflicting marks that would bar registration" of the MAISON JULES mark based on a likelihood of confusion. (Ex. D80). This determination, communicated in an office action, was based on the examining attorney's review of the USPTO database of both registered marks and pending registrations, which at that time included the JOULES mark. *Id.*

Joules contends that the Court should not give weight to the examining attorney's statement, because the office action did not represent a final determination by the USPTO. *See Patsy's Italian Restaurant, Inc. v. Banas*, 508 F. Supp. 2d 194, 215 (E.D.N.Y. 2007). Although such a decision is entitled to less weight than a final determination, courts nonetheless accord weight to the initial conclusions of the USPTO, in light of the "expertise of the trademark examiners," which "entitle[s] their views to respectful consideration." *D.M. & Antique Imp. Corp. v. Royal Saxe Corp.*, 311 F. Supp. 1261, 1274 (S.D.N.Y. 1969) (Lasker, J.); *see also Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 148 n.11 (2d Cir. 1997) (according weight to the initial conclusions of the USPTO); *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 392-93 (2d Cir. 1995); *Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 292-93 (S.D.N.Y. 2012) (Engelmayer, J.) (acknowledging that deference is due to decisions of the USPTO, but that such deference is "limited" when a decision is not final).